IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,197

In the Matter of MARK A. SAMSEL,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held May 8, 2024. Opinion filed June 14, 2024. Two-year suspension stayed, conditioned upon successful participation and completion of two-year probation period.

*Matthew J. Vogelsberg*, Chief Deputy Disciplinary Administrator, argued the cause, and *Amanda G. Voth*, Deputy Disciplinary Administrator, was on the formal complaint for the petitioner.

*Mark A. Samsel*, respondent, argued the cause pro se.

PER CURIAM: This is an attorney discipline proceeding against Mark A. Samsel, of Wellsville. Samsel received his license to practice law in Kansas on September 24, 2010. Samsel is also a licensed attorney in Missouri, admitted in 2011.

On October 31, 2023, the Disciplinary Administrator's office filed a formal complaint against Samsel alleging violations of the Kansas Rules of Professional Conduct. The complaint stemmed from Samsel's behavior and actions as a substitute teacher for an art class at Wellsville High School and subsequent conduct during administrative proceedings regarding his substitute teaching license.

On December 7, 2023, the parties entered into a summary submission agreement under Supreme Court Rule 223(b) (2024 Kan. S. Ct. R. at 275) (summary submission is

1

"[a]n agreement between the disciplinary administrator and the respondent," which includes "a statement by the parties that no exceptions to the findings of fact or conclusions of law will be taken").

In the summary submission agreement, the Disciplinary Administrator and Samsel stipulate and agree that Samsel violated the following Kansas Rules of Professional Conduct (KRPC):

- KRPC 8.4(b) (2024 Kan. S. Ct. R. at 430) (misconduct—criminal act reflecting adversely on fitness);
- KRPC 8.4(e) (2024 Kan. S. Ct. R. at 430) (misconduct—ability to influence improperly); and
- KRPC 8.4(g) (2024 Kan. S. Ct. R. at 430) (misconduct—reflecting adversely on fitness to practice law).

FACTUAL AND PROCEDURAL BACKGROUND

We quote the relevant portions of the parties' summary submission below.

"Findings of Fact—Petitioner and Respondent stipulate and agree that Respondent engaged in the following misconduct:

. . . .

"DA 13,711

"3.    On April 28, 2021, Respondent Mark Samsel substitute taught in art class at Wellsville High School. Respondent, then working as an attorney and state representative, had also obtained his emergency substitute teaching license on May 12, 2020.

"4.    During fifth hour art class, Respondent started the class by playing music as the students entered the classroom and telling the students that he 'had the floor' unless

someone else raised their hand and was recognized, and that it was going to be 'the most uncomfortable class of [their] life.' He then proceeded to do many things throughout the class period that made some students uncomfortable.

"5. Respondent talked about God, the devil, suicide, and mental health. He told the class that God was speaking through him. Some students later reported feeling uncomfortable, to the point that some of them left the room for a break.

"6. Respondent seemed focused on one student in particular: T.E. Respondent acknowledges this and states that he had known T.E. for many years. Respondent stated T.E. was disrupting the classroom without being recognized and repeatedly disregarded Respondent's requests, including to leave the classroom and calm down or go to the principal's office. At one point, Respondent grabbed T.E. from behind and lifted him up.

"7. During the class period, Respondent also pushed T.E. against the wall. T.E. reported this caused him to get a mark(s) on his back.

"8. Respondent also kicked or kneed T.E. in the groin area. T.E. laid on the ground after Respondent kicked him.

"9. Respondent asked T.E. if it hurt and told T.E. he could go to the nurse to have her check 'it' for him. Respondent also told D.W., a classmate, he could 'check [T.E.'s] nuts for him.'

"10. In an interview with law enforcement, T.E. stated that Respondent grabbed him by the shoulders and shoved him against the wall. T.E. stated he did not want to be touched and was scared by what had happened. He stated that about ten minutes later, Respondent approached him and told him he was going to kick him in the 'balls.' T.E. stated that another ten minutes went by when Respondent kicked T.E. in the groin with his right foot. T.E. winced over in pain and felt confused.

"11. J.G. stated that during the class period, Respondent bent over and grabbed J.G. by the shoulders, asking her whether she had mental health problems. J.G. stated she felt scared because she had PTSD and did not like people grabbing her. She thought Respondent was going to hurt her.

"12. While the class period progressed, one of the students texted her mom, who was a teacher at the middle school, stating that Respondent was 'crazy,' and that he had 'just hardcore kicked [T.E.] in his balls.' Even though the student's mom was teaching, she alerted administration.

"13.  As part of its investigation, law enforcement interviewed Respondent the following day, April 29, 2021.

"a.  Respondent advised law enforcement he believed it was his mission from God to save kids from suicide. He identified numerous kids he believed to be struggling with anxiety and depression.

"b.  Respondent demonstrated that he 'barely grabbed' T.E. by the shoulders, told him to stop, and then let go when T.E. got close to the wall. Respondent stated he heard T.E. had a bruise, opined that T.E. bruises 'softly,' but that 'God works in mysterious ways.'

"c.  He told law enforcement: 'Even though I didn't want to do any of the things I did right there and this is what's going to end me up in a manic hospital probably, because it has all the appearances of a psychotic episode, or manic episode and I know because I did have them in the past but I went through doctors . . . and I've been healthy for, shoot, probably almost a full year now.'

"d.  Respondent explained he had a crystal-clear moment, and believed God was telling him what he was supposed to do. He believed God had told him 'twice' that he could act physically toward T.E.

"14.  Law enforcement arrested Respondent and he was charged with three counts of misdemeanor battery, all class B person misdemeanors. The criminal complaint listed the victims of the batteries as T.E. (two counts) and J.G. Both victims were [minors].

"15.  Following the incident in the classroom, Respondent posted a story on SnapChat, stating the entire incident was planned to send a message about mental health and teenage suicide. The message stated that God planned it and that many of the kids were in on it. However, according to interviews conducted by law enforcement, none of the students interviewed knew about any 'plan' or staged the event ahead of time.

"16.  On May 24, 2021, Respondent emailed the Office of the Disciplinary Administrator (ODA), advising the ODA that he had been formally charged with three counts of misdemeanor battery.

4

"17. Respondent pled guilty on September 13, 2021, to an Amended Complaint that contained three counts of disorderly conduct, all class C nonperson misdemeanors.

"18. On that same day, the district court placed Respondent on 12 months' probation with a 90-day underlying sentence. As conditions of probation, Respondent could not have contact with the victims and had to write them apology letters. He was also ordered to comply with mental health treatment and to take all prescribed medications.

"19. In Respondent's response, dated October 29, 2021, he stated he was suffering from 'a manic episode with psychotic effects (break from reality) in the classroom caused by the stress, agitation, and pressure of both the events leading up to that day in the classroom and the day of.' Due to this, he believed he was supposed to 'stage an outrageous event to bring attention to mental health, especially for kids.' He continued: 'After asking the student to stop several times and even backing away from him, the agitation and stress continued and created a grandiose scheme in my mind that I—working along with these kids—was supposed to stage an outrageous event to bring attention to mental health, especially for the kids. Because I told the student exactly what I was going to do before I did anything . . . , and then he continued to step at me to push me in the chest again, my mind interpreted all this as part of the grandiose plan.'

"20. During an interview with Mr. Tom Stratton (former Director of Investigations with the ODA) in April 2022, Respondent advised he had been in a manic bipolar state for a few days before April 28, 2021, and for a few months after.

"21. Respondent successfully completed probation in his Franklin County criminal case on September 13, 2022.

"22. T.E., through his father, filed a civil case against Respondent, Board of Education Unified School District of Franklin County, and Morgan Hunter Corporation. The case was filed in Franklin County District Court, court case number FR-2022-CV-000039. The case settled around September 2023, and no documents or admissions were filed as part [of] the settlement agreement. The terms of the settlement are confidential and not known to the ODA.

"DA 13,748

"23. Respondent obtained an emergency substitute teaching license on May 12, 2020.

"24. Based on the foregoing incident that had occurred on April 28, 2021, Dr. Mischel Miller, Director of the Kansas State Department of Education's Teacher Licensure and Accreditation team, filed a complaint with the Kansas State Board of Education's Professional Practices Commission, alleging that Respondent had engaged in professional misconduct. The complaint from the Kansas State Department of Education (KSDE) was dated June 15, 2021.

"25. The filing of the KSDE complaint triggered administrative proceedings. These administrative proceedings are investigated and prosecuted by KSDE. Scott Gordon serves as counsel to KSDE. The Kansas State Board of Education (KSBE) acts as the decision-maker regarding the license.

"26. Respondent entered his appearance as counsel on behalf of himself and requested a hearing.

"27. Respondent also filed a request for discovery, request for settlement, and request to dismiss the complaint. The date on the certificate of service for these requests was July 5, 2021. None of these motions were on his State of Kansas legislative representative letterhead.

"28. On July 20, 2021, during a prehearing conference, certain deadlines in the administrative proceedings were set, in addition to the date and time of the hearing.

"29. That same afternoon or shortly thereafter, Gordon and Respondent spoke via phone. Gordon reported that he advised Respondent that his client's position was that Respondent's misconduct was severe enough that it was not appropriate for Respondent to remain licensed as a teacher. Gordon reported that he also explained that he represented the Kansas State Department of Education as the complainant, and that it was the Kansas State Board of Education that would make a determination regarding his license. Gordon stated that Respondent seemed to understand the distinction, and appreciated the clarification on the relationship between his client and the Board.

"30. A little over a week later, on July 30, 2021, Respondent sent an email to Gordon, Commissioner of Education Dr. Randy Watson, and Dr. Miller. As the Commissioner of Education, Dr. Watson was the appointed Chief Administrative Officer over the Kansas State Department of Education. Dr. Watson and Dr. Miller are the employees of Gordon's client, the KSDE (the investigative and prosecution entity).

6

"a.   The body of the email stated:  'Please find attached a letter for your consideration.' It was signed:  'Mark A. Samsel, Samsel Law LLC' with his law firm's logo.

"b.   Attached to the email was a letter on Respondent's legislative letterhead. The top of the letterhead stated:  'State of Kansas House of Representatives' with 'Mark Samsel' and '5th District.' The subject line was 'Kansas (Emergency) Substitute Teaching License and Renewal.'

"c.   In his letter, Respondent welcomed an opportunity to speak with the three of them in person, noting that Gordon 'expressed that KSDE might not be interested in such a meeting, so I don't want to seem as though I'm undercutting him. *However, I also know we must work together, including in the Kansas Legislature and House Education Committee*.' (Emphasis added.)

"d.   He continued:  'Either way, I pray this letter sheds some light on what transpired and may *help lead all of us to work collaboratively for positive change in Kansas*, hopefully to a day where we can again lead the nation in mental health, service, and education, as Osawatomie State Hospital proudly did over a century ago.' (Emphasis added.)

"e.   Respondent's 11-page letter detailed his personal mental health struggles. He stated that he shared the information about his mental health not asking for sympathy, but for perspective and the reason he believed God had called him to shed light on mental health issues. He continued:  'In my frequent work in this area, it is partly why we focus on "the whole child." *If we work together in this moment, I genuinely believe we can bring so much good to Kansas and the world*.' (Emphasis added.)

"f.   Respondent referenced his legislative work throughout the letter.

"i.   Following a paragraph about his mental health, he stated:  'I hope you will thoroughly consider the surrounding circumstances. Those days both before and after the incident are the most stressful of the entire legislative session. By way of example, on April 8, 2021, I forcefully opposed Senate Bill (SB) 55, which Governor Laura Kelly described as "send[ing] a devastating message . . . to children

7

and their families . . . who are already at a higher risk of bullying, discrimination, and suicide."'

"ii. 'I publicly—in speech and vote—took a powerful position in support of our kids, LGBT community, and mental health, this truth was of no concern to those controlling the media channels.'

"g. After asking 'whether KSDE has a policy involving mental health or other conditions,' Respondent requested the KSDE to 'give serious consideration to these public policy questions of great importance. As I noted above, it is difficult to accept that a single incident of a mental health injury should warrant a permanent, lifelong sanction and ban. *My concern is amplified considering my longstanding commitment and record of supporting the very things for which KSDE stands, namely the kids and our public educators, at times working alongside Deputy Commissioner Dale Dennis*.' (Emphasis added.)

"h. He concluded the letter by stating: 'Given the circumstances, I genuinely would like to work with KSDE to promote our common and shared goals rather than remain in an adversarial position.'

"31. Respondent voluntarily surrendered his substitute teaching license on August 3, 2021, and the Board accepted the voluntary surrender.

"32. Gordon filed a complaint with the ODA, received on August 19, 2021, related to the letter outlined above.

"33. Respondent responded to the complaint on September 16, 2021. He noted in his response that he surrendered his substitute teaching license on his legislative letterhead, and generally denied wrongdoing.

"Conclusions of law—Petitioner and Respondent stipulate and agree that Respondent violated the following Kansas Rules of Professional Conduct:

"KRPC 8.4(b) (misconduct—criminal act reflecting adversely on fitness);

"KRPC 8.4(g) (misconduct—reflecting adversely on fitness to practice law); [and]

"KRPC 8.4(e) (misconduct—ability to influence improperly)[.]

8

"Applicable aggravating and mitigating circumstances—Petitioner and Respondent stipulate and agree that the following aggravating and mitigating factors apply:

"34.  Aggravating circumstances:

  "a.  *Multiple offenses*:  Respondent violated KRPC 8.4(b), KRPC 8.4(g), and KRPC 8.4(e).

  "b.  *Vulnerability of victim*:  Two recognized ABA subparts are relevant:  1) the victims were high school children; 2) Respondent had a fiduciary duty to the students he was substitute teaching; there was an unequal power relationship.

      "i.  Respondent was initially charged with three counts of battery against two high school students, but later pled to three counts of disorderly conduct. Both high school students were [minors]. Respondent was the only adult in the classroom of high school students and was responsible for the classroom as the substitute teacher.

  "c.  *Illegal conduct*:  Respondent was charged with three counts of misdemeanor battery, which was later pled down to three counts of disorderly conduct, class C nonperson misdemeanors. The Franklin County District Court sentenced Respondent to 90 days underlying and 12 months probation. Respondent was successfully discharged after serving one year of probation.

"35.  Mitigating circumstances:

  "a.  *Absence of a prior disciplinary record*:  Respondent has been an active member of the Kansas bar and in good standing since September 10, 2010, with no prior instance of professional misconduct.

  "b.  *Absence of dishonest or selfish motive*:  Evidence shows Respondent was suffering from undiagnosed Bipolar Disorder at the time of the incidents and there is no evidence to suggest he had a dishonest or selfish motive.

9

"c.    *The present and past attitude of the attorney as shown by his cooperation during the proceeding and his full and free acknowledgment of the transgressions, evidenced as follows*:

   "i.    Respondent self-reported the April 28, 2021, incident, and has been fully cooperative in the disciplinary process.

   "ii.   In 2018 and prior to the instances giving rise to professional misconduct, Respondent had voluntarily sought treatment for unknown mental health problems—later determined to be Bipolar Disorder—and cooperated fully with medical providers. Prior to the instances giving rise to professional misconduct, Respondent had no knowledge of the predominant mental defect, Bipolar Disorder, or its manic or psychotic symptoms, underlying or causing the professional misconduct. Prior to the instances giving rise to professional misconduct, Respondent had sought help from and cooperated with KALAP, a pattern which has continued. Respondent has consistently sought help from Dr. Lambert since August 2018, and aside from the timeframe which underlies the professional misconduct in which Respondent was suffering from severe, prolonged manic and psychotic effects, he has fully relied on and followed his doctor's recommendations.

   "iii.  Respondent has worked with a KALAP monitor since April 2023.

"d.    *Previous good character and reputation in the community including any letters from clients, friends, and lawyers in support of the character and general reputation of the attorney*. Respondent was a Missouri Valley College outstanding alumni in 2015. He also had previously made partner at Lathrop and Gage.

"e.    *Mental disability or chemical dependency including alcoholism or drug abuse when*:

   "i.    *there is medical evidence that the respondent is affected by a mental disability;*

10

"1.  On October 2, 2023, Respondent's psychiatrist ('Doctor') provided a written report indicating that Respondent has been under his consistent care and treatment since August 7, 2018.

"2.  Doctor stated that he was aware of Respondent's active disciplinary matters as a licensed attorney including those matters pertaining to events on April 28, 2021, and July 30, 2021.

"3.  Doctor indicates that his letter is intended to address certain specific issues that pertain to the disciplinary matters and provide his professional opinion regarding Respondent's mental health during the timeframe that includes those courses of events.

"4.  First, Doctor opines that Respondent is affected by mental disability, Bipolar Affective Disorder—Type I.

"5.  Prior to March 2021, Doctor notes that he treated Respondent principally for depression, anxiety, and insomnia, but had also diagnosed Respondent with Unspecified Mood Disorder. Doctor further indicates that he discussed with Respondent the possibility that he may have Bipolar Disorder, but that Respondent had not yet demonstrated a clear period of hypomania or mania to justify a diagnosis of Bipolar Disorder.

"6.  Beginning in March 2021, Doctor reports that he began receiving information from collateral sources describing symptoms that raised concern that Respondent was experiencing a manic episode.

"7.  Toward late March 2021, Doctor describes additional reports from collateral sources of changes in Respondent's behavior that were atypical of Respondent, most notably impulsively spending money.

"8.  On April 2, 2021, Doctor notes that he visited with Respondent, who downplayed the concerns. Respondent reported a few symptoms potentially consistent with mania, most notably irritability and a decreased need for sleep, but also reported that the symptoms lasted only a couple days occurring during an increased period of stress at the Legislature. Doctor reports that they discussed the possibility of manic symptoms and the potential need for treatment changes.

11

"9.  Then, in late April 2021, Doctor notes that Respondent's family phoned in reporting worsening of Respondent's condition and a desire for him to be seen at a psychiatric facility with concerns about his state of mind.

"ii.  *the mental disability caused the misconduct;*

"1.  On April 29, 2021, Doctor reports that he spoke with Respondent, which was the day after Respondent's incident while substitute teaching on April 28, 2021. During the phone call, Doctor reports that Respondent demonstrated no insight into his condition, which Doctor states that he attempted to explain to Respondent is often a significant problem during a manic episode (i.e. by definition, without sufficient insight patients are effectively unaware of an active mental health change/decline and the need for treatment).

"2.  During the April 29, 2021, visit, Doctor states that Respondent's lack of insight was most evident when Respondent informed Doctor that he could understand why others around him might think he was experiencing mania, but felt he was fine and did not need treatment.

"3.  Over the next few days, Doctor received continued reports from Respondent's family and friends of concerns about Respondent's mental health and erratic behavior, including statements and actions that were categorically bizarre for Respondent.

"4.  During a telehealth visit on May 4, 2021, while accompanied by another state legislator, Doctor reports that Respondent explicitly exhibited mania with psychosis during the visit, such as identifying 'divine province' as the explanation for the incident on April 28, 2021. Doctor recommended that Respondent immediately present for psychiatric evaluation, hospitalization, and initiation of medication treatment for mania with psychosis. Doctor notes that Respondent expressed appreciation for Doctor's concern, but Respondent's lack of insight and impaired reasoning and judgment led Respondent to defer treatment.

12

"5.  On May 11, 2021, Doctor states that he met with Respondent again, but Respondent continued to display lack of decision-making capacity by deferring medication treatment and denying authorization for Doctor to speak with any family members about his condition or treatment. Respondent's family had continued to report behavior and statements consistent with an ongoing manic episode and a hope to pursue involuntary hospitalization or other measures.

"6.  Second, Doctor opines that during the time of the events in question, predominately on April 28, 2021, and thereafter, Respondent was experiencing a manic episode with psychotic symptoms, most notably grandiose delusions. In Doctor's opinion, Respondent's 'misconduct,' as well as other conduct over the course of time, occurred because he was experiencing severe, prolonged manic symptoms as well as delusional grandiosity.

"7.  Doctor concludes that, in other words, Respondent's mental disability caused the misconduct. According to Doctor's opinion, due to the disabling mental health condition, Respondent did not recognize that he was experiencing manic or psychotic symptoms and was unable to understand the nature of his action during the symptomatic period and the potential consequences of those actions.

"iii.  *the respondent's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and*

"1.  Third, Doctor opines that Respondent's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful remission of symptoms.

"2.  After May 11, 2021, Doctor reports that Respondent had several appointments with him during which the manic symptoms began to improve. Doctor indicates that Respondent regained some degree of insight and started medication treatment in September 2021.

13

"3. Doctor reports that although the manic episode and related psychotic symptoms eventually resolved, Respondent began to experience a depressive episode as part of Bipolar Disorder. Doctor notes that Respondent continued to experience impairment caused by Bipolar Disorder until he started the medication lithium on February 16, 2022, after other medication treatments proved ineffective.

"4. Since February 16, 2022, Doctor reports that Respondent has responded well to the prescribed treatment and has demonstrated a meaningful and sustained period of successful remission of symptoms (rehabilitation would not be the appropriate psychiatric/medical term in this context as no 'chemical dependency' was ever involved).

"iv. *the recovery arrested the misconduct and recurrence of that misconduct is unlikely;*

"1. Fourth and finally, Doctor opines that Respondent's recovery has arrested the misconduct and recurrence of any misconduct is unlikely. Doctor notes that treatment has proven effective to achieve remission of Bipolar Disorder symptoms. Doctor observes that, in other words, Respondent has not experienced any periods of depression or mania since starting lithium.

"2. Doctor further opines that a recurrence of the underlying 'misconduct' is unlikely for two primary reasons. First, Respondent has experienced a clearly beneficial and sustained response to lithium, which Doctor anticipates will continue. Second, having now experienced severe manic symptoms with psychosis and being aware of his diagnosis/condition, Respondent is much more aware of his need for ongoing treatment for Bipolar Disorder and more receptive to treatment changes, if needed.

"f. *Imposition of other penalties or sanctions*: 1) Franklin County case FR-2021-CR-000129; and 2) Franklin County case FR-2022-CV-000039.

14

"i.  The Franklin County Attorney's Office filed charges against Respondent on May 17, 2021. The complaint charged Respondent with three misdemeanor counts of battery naming two of the high school students as victims. The Franklin County Attorney's Office filed an amended complaint on September 15, 2021, which charged Respondent with three counts of disorderly conduct, which Respondent pled to. Respondent was placed on 12 months['] probation with Court Services, which he successfully completed on September 13, 2022.

"ii.  T.E., through his father C.E., filed a civil suit on April 27, 2022, against Respondent, Board of Education Unified School District No. 289 Franklin County, and Morgan Hunter Corporation d/b/a Morgan Hunter Education. That suit was settled around September 2023, with the terms of the settlement agreement remaining confidential and unknown to the Office of the Disciplinary Administrator.

"g.  *Remorse*

"i.  Respondent apologized to the two high school students and further, after remission of the Bipolar Disorder symptoms, publicly apologized, including in an interview and lengthy article published by the Kansas City Star. The apology included a transparent account of his mental health.

"Recommendation for Discipline—Petitioner and Respondent stipulate and agree that the following discipline should be imposed:

"36.  A period of suspension of Respondent's license to practice law for a period of 12 months, STAYED, and placement on probation for 12 months. Probation would be subject to the terms and conditions of Respondent's plan of probation and KALAP monitoring agreement, which are incorporated herein by reference.

15

"37. Terms and conditions of the 12 months of probation shall include:

"a.   Compliance with Rules of Professional Conduct

"i.    Respondent shall not engage in conduct that violates the Rules of Professional Conduct.

"ii.   Receipt of a complaint by the Office of the Disciplinary Administrator during the probation term alleging that Respondent has violated the Rules of Professional conduct does not, in itself, constitute a violation of the terms of probation; and

"iii.  In the event the ODA receives a complaint during Respondent's participation in the probation program or otherwise opens or commences a disciplinary investigation, the term of the probation shall be extended until such charge has been investigated and a determination made by the ODA or regional disciplinary committee regarding disposition of such matter.

"b.   Mental Health Treatment

"i.    Respondent has been under the care of a clinician already at the time of the inception of probation. Respondent will comply with the treatment recommendations prescribed by Dr. Garrett Lambert, M.D.

"ii.   Respondent shall remain under the care of Dr. Lambert for treatment of Bipolar I Disorder or any other mental health issues that are identified throughout the term of his probation. Respondent shall comply with any counseling or medication directives given by his treatment provider.

"iii.  Respondent will sign releases so that any records can be provided to the Disciplinary Administrator's Office and to his KALAP monitor at any time. Respondent will provide documentation confirming his compliance with treatment recommendations as directed by the assigned Deputy Disciplinary Administrator.

16

"iv. Prior to any change of treatment providers, Respondent shall obtain the approval from his KALAP monitor and director of KALAP.

"c. Voluntary KALAP Monitoring Agreement

"i. Respondent has been monitored by Calvin 'Cal' Williams since April 28, 2023. Cal Williams is a full-time lawyer in private practice located in Salina, Kansas, and has practiced law for 45 years. He graduated from Washburn School of Law in 1978. Although the monitoring agreement is effective through April 2024, Respondent agrees that it will be effective throughout the duration of his probation in the disciplinary matter.

"ii. Respondent agreed to use alcohol in a moderate and legal manner, to take medications only as prescribed, and to comply with the directions of the prescribing health professional.

"iii. Respondent agreed to report to the director of KALAP and to the monitor, any incidences of his failure to abide by any provision of the agreement.

"iv. Respondent agreed to meet with the monitor monthly, or as otherwise directed by the monitor, throughout the duration of the agreement.

"v. Respondent agreed to continue therapy with Dr. Lambert, as he deems appropriate and necessary. Respondent agreed to not discontinue therapy without first consulting both the doctor and the KALAP program director. However, as part of the Probation Plan, Respondent agrees to continue therapy with Dr. Lambert throughout the duration of probation.

"vi. Respondent agreed to continue medication management with his current prescribing physician and to follow recommendations.

"vii. Respondent agreed to a release of information to the director of KALAP and for his monitor to make written or oral reports regarding Respondent's compliance or noncompliance.

17

"viii. Respondent agreed to a daily regimen of self-care, as outlined in the monitoring agreement.

"ix. Respondent shall deliver a copy of the probation plan to KALAP.

"x. Should the monitor discover any violations of the Kansas Rules of Professional Conduct, he shall include such information in a report to the Disciplinary Administrator's Office in order for the Disciplinary Administrator's Office to investigate these violations.

"d. Standard Terms

"i. Respondent shall attend any scheduled meetings with the Office of the Disciplinary Administrator and meet any deadlines set by the Office of the Disciplinary Administrator.

"ii. Respondent certifies he has read and is familiar with his obligations under the Kansas Rules of Professional Conduct. Respondent shall not violate the provisions of his probation or the Kansas Rules of Professional Conduct. In the event Respondent violates any of the terms of his probation or any of the terms of the Kansas Rules of Professional Conduct during the probationary period, Respondent shall immediately report such violations to the Disciplinary Administrator.

"iii. The KALAP monitor shall be acting as an agent and volunteer of the Court while monitoring Respondent, and is afforded all immunities by Supreme Court Rule 233(j).

"iv. Respondent shall continue to cooperate with the Disciplinary Administrator's Office. If the Disciplinary Administrator requires any further information, Respondent shall timely provide said information.

"v. Respondent shall pay the costs in an amount to be certified by the Disciplinary Administrator's Office.

. . . .

18

"Additional stipulations agreed to by the Petitioner and Respondent:

"42. Respondent waives his right to a hearing on the formal complaint as provided in Supreme Court Rule 223(b)(4).

"43. The parties agree that no exceptions to the findings of fact and conclusions of law will be taken.

"44. Pursuant to Supreme Court Rule 223(d), a copy of this Summary Submission Agreement will be provided to complainant Scott Gordon. Gordan will have 21 days to provide the disciplinary administrator with his position regarding the agreement.

"45. A copy of this Summary Submission Agreement, along with a copy of the complainant's position, will be forwarded to the Chair of the Board for the Discipline of Attorneys for his review under Supreme Court Rule 223(e). The parties understand and agree that if the Summary Submission Agreement is rejected by the Board chair, this matter will proceed to a disciplinary hearing pursuant to Supreme Court Rule 222.

"46. The parties agree that if the Summary Submission Agreement is approved by the Board chair, the hearing on the formal complaint will be cancelled, and the case will be docketed with the Supreme Court under Supreme Court Rule 228. The parties will be required to appear before the Supreme Court for oral argument.

"47. Respondent understands and agrees that pursuant to Supreme Court Rule 223(f), this Summary Submission Agreement is advisory only and does not prevent the Supreme Court from making its own conclusions regarding rule violations or imposing discipline greater or lesser than the parties' recommendation.

"48. The parties agree that the exchange and execution of copies of this Agreement by electronic transmission shall constitute effective execution and delivery of the Agreement and that copies may be used in lieu of the original and the signatures shall be deemed to be original signatures."

## DISCUSSION

In a disciplinary proceeding, this court generally considers the evidence, the disciplinary panel's findings, and the parties' arguments to determine whether KRPC

19

violations exist and, if they do, the appropriate discipline to impose. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see also Supreme Court Rule 226(a)(1)(A) (2024 Kan. S. Ct. R. at 279) (a misconduct finding must be established by clear and convincing evidence). "Clear and convincing evidence is 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Morton*, 317 Kan. 724, 740, 538 P.3d 1073 (2023).

The Disciplinary Administrator provided Samsel with adequate notice of the formal complaint. The Disciplinary Administrator also provided Samsel with adequate notice of the hearing before the panel, but he waived that hearing after entering into the summary submission agreement. The Kansas Board for Discipline of Attorneys approved the summary submission and canceled the formal hearing under Rule 223(e)(2). As a result, the factual findings in the summary submission are deemed admitted. See Supreme Court Rule 228(g)(1) (2024 Kan. S. Ct. R. at 285) ("If the respondent files a statement . . . that the respondent will not file an exception . . . the findings of fact and conclusions of law in the final hearing report will be deemed admitted by the respondent.").

Rule 223 establishes the following requirements for a valid summary submission agreement:

"An agreement between the disciplinary administrator and the respondent to proceed by summary submission must be in writing and contain the following:

(1) an admission that the respondent engaged in the misconduct;
(2) a stipulation as to the following:
    (A) the contents of the record;
    (B) the findings of fact;

20

> (C) the conclusions of law, including each violation of the Kansas Rules of Professional Conduct, the Rules Relating to Discipline of Attorneys, or the attorney's oath of office; and
>
> (D) any applicable aggravating and mitigating factors;
>
> (3) a recommendation for discipline;
>
> (4) a waiver of the hearing on the formal complaint; and
>
> (5) a statement by the parties that no exceptions to the findings of fact or conclusions of law will be taken." Rule 223(b) (2024 Kan. S. Ct. R. at 275).

Here, the written summary submission agreement contained all the information required under Rule 223. See Rule 223(b). And the summary submission and the parties' stipulations before us establish by clear and convincing evidence the charged conduct violated KRPC 8.4(b), (e), and (g). Thus, we adopt the findings and conclusions set forth in the summary submission.

The remaining issue is deciding the appropriate discipline. The parties jointly recommend a one-year suspension of Samsel's license, and that the suspension be stayed and Samsel be placed on probation for one-year. But an agreement to proceed by summary submission is advisory only and does not prevent us from imposing discipline greater or lesser than the parties' recommendation. Rule 223(f).

After full consideration, we hold that a two-year suspension is the appropriate discipline under the circumstances. We acknowledge respondent's mental health was a contributing factor to his misconduct, and he has made significant progress in this respect upon diagnosis and adherence to a successful treatment protocol. But given the nature of the underlying conduct, we believe a suspension of more than one year is warranted. Cf. *In re Harrington*, 296 Kan. 380, 394, 293 P.3d 686 (2013) (imposing two-year suspension on attorney convicted of battery, driving under the influence, and obstruction

of official duty); *In re Frahm*, 291 Kan. 520, 531, 241 P.3d 1010 (2010) (imposing three-year suspension on attorney convicted of driving under the influence and two counts of aggravated battery). Respondent's license is thus suspended for two years.

The suspension is stayed conditioned on respondent's successful performance and completion of two years' probation, subject to the terms and conditions of the probation plan and KALAP monitoring agreement. Additionally, to ensure that respondent is best positioned to succeed and that the public is adequately safeguarded while respondent practices law in a solo practice setting, the two years' probation is also subject to a practice supervision plan approved by the Disciplinary Administrator's office.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Mark A. Samsel is suspended for two years, effective the date of this opinion, in accordance with Supreme Court Rule 225(a)(3) (2024 Kan. S. Ct. R. at 278) for violations of KRPC 8.4(b), (e), and (g). The suspension is stayed conditioned upon Samsel's successful participation and completion of a two-year probation period. Probation will be subject to the terms set out in the probation plan and KALAP monitoring agreement referenced in the parties' summary submission agreement and the practice supervision plan as approved by the Disciplinary Administrator's office. No reinstatement hearing is required upon successful completion of probation.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.

22